Emmett PULLIAM, Appellant,

v.

STATE of Missouri, Respondent.

No. 56077.

Supreme Court of Missouri, Division No. 1.

June 12, 1972.

Sidney Fortus, Clayton, for petitioner-appellant.

John C. Danforth, Atty. Gen., Richard S. Paden, Asst. Atty. Gen., Jefferson City, for respondent.

HIGGINS, Commissioner.

Appeal from denial, after evidentiary hearing, of motion under Rule 27.26, V.A.M.R., to vacate and set aside judgment of conviction of murder, second degree.

Emmett Pulliam, charged with murder for shooting his wife, Earline Viola Pulliam, "wilfully, unlawfully, feloniously, premeditatedly, and of his malice aforethought," pleaded guilty to murder, second degree, March 25, 1968. On May 10, 1968, the court assessed his punishment at 12 years' imprisonment, and sentence and judgment were rendered accordingly. §§ 559.020, 559.030, V.A.M.S.

On August 4, 1969, Emmett Pulliam filed his motion, alleging as all his known grounds for relief:

8(a) "Petitioner's plea of guilty was involuntary and the product of an unconstitutional bargain * * *."

8(b) "The information * * * is fatally defective and fails to charge * * * murder second degree by omission of the essential averment that the acts were with intent to kill."

8(c) "The information is fatally defective in omitting the essential averment that the deceased was 'killed or murdered,' and will not therefore, charge the offense of murder in any degree."

On August 4, 1969, Emmett Pulliam, assisted by counsel, filed his amended motion, to add, as grounds for relief:

8(d) "Petitioner was legally incapable by reason of insanity at such time to enter his plea of guilty herein or to be sentenced."

8(e) " * * * petitioner was incapable of understanding the nature and consequences of his guilty plea herein or of his sentencing."

8(f) "That the Court's acceptance of such plea and sentencing was unlawful, illegal and did violate the constitutional rights of petitioner * * *."

8(g) "That in fact, a psychiatric examination of petitioner * * * did indicate that petitioner was unable to form the intent necessary to constitute Second Degree Murder and, hence, petitioner could not and should not have pleaded guilty to such charge and recommending and allowing him to do so was a violation of law and of his constitutional rights * * *."

8(h) "That petitioner's attorney and the Prosecuting Attorney possessed knowledge of the results of the psychiatric examination * * * and, yet, did allow, recommend, encourage and induce petitioner to so plead, all in violation, etc., * * *."

8(i) "That the failure of petitioner's counsel and the Prosecuting Attorney to advise this Court * * * relating to said psychiatric examination was misleading, improper, illegal and in derogation of the rights of this petitioner * * *."

8(j) "That the failure of the Court to order a psychiatric examination of movant and to hold a hearing on the question of his competency * * *, resulted in a denial of movant's constitutional rights * * *."

8(k) "That by virtue * * * petitioner's plea of guilty resulted from and was induced by fraud, misrepresentation, misapprehension, persuasion and the holding out of false hopes which proved to be false and ill found."

At the time of his guilty plea, March 25, 1968, defendant was represented by Mr. Paul Dobberstein, Jr., and the following took place:

"THE COURT: All right, Mr. Pulliam. You are charged here by indictment in this Circuit Court with the charge of Murder In The Second Degree, * * * And you understand what you are charged with? "THE DEFENDANT: Yes, sir.

"THE COURT: And you care at this time to read—or you have something to say about the waiver of the reading of the indictment? MR. DOBBERSTEIN: Yes, Your Honor, the defendant will waive the reading of the indictment and at this time he will withdraw his former plea of not guilty and enter a plea of guilty to the charge.

"THE COURT: Do you understand fully, Mr. Pulliam, what your lawyer has said; that you are withdrawing your former plea of not guilty and entering a plea of guilty, you understand that? THE DEFENDANT: Yes, sir. THE COURT: And you are not today addicted to alcohol or narcotic drugs are you? THE DEFENDANT: No, I'm not. THE COURT: And you know what you are doing, is that right? THE DEFEND-

ANT: Yes. THE COURT: Now, you understand also that you have a right to a trial by jury and only you can waive this right, do you, Mr. Pulliam? THE DEFENDANT: Right. THE COURT: And you have discussed this matter with your attorney fully and with the members of your family, is that correct? THE DEFENDANT: Yes, sir. THE COURT: And it is your desire to waive trial by jury? THE DEFENDANT: Yes.

"THE COURT: Do you have anything to say, Mr. Settich? MR. SETTICH: Yes, Judge. Very briefly, the defendant is charged with the offense of Murder In The Second Degree and the State alleges that on the 13th day of May 1967 that the defendant with a .22 caliber pistol shot it at his wife, Earline Viola Pulliam, and as a result of this gunshot wound why she passed away—well, she was dead on arrival at St. Louis County Hospital and that was at 5:09 a. m. on May 13 and the Coroner's Report shows the cause of death due to gunshot wound of the left chest. The defendant was apprehended shortly after the shooting and the gun that was used in this matter was recovered and the defendant admitted shooting his wife after having an altercation with her and the State would make a recommendation to the offense of Murder In The Second Degree of twelve years in the Missouri Department of Corrections.

"THE COURT: All right, you heard, Mr. Pulliam, what the Prosecuting Attorney has said. You understand what he has just said? THE DEFENDANT: Yes.

"THE COURT: You have something to say, Mr. Dobberstein, at this time? MR. DOBBERSTEIN: Yes, Your Honor. The defendant would request that sentencing be deferred and a pre-sentence investigation be ordered. THE COURT: Very well, we will defer sentencing at this time until April the 29th and we'll order a pre-sentence investigation. Now, you understand, Mr. Pulliam, that this does not necessarily mean that you will be given any

consideration on probation. The Court is not committing itself in either way, you understand that fully? THE DEFENDANT: I understand.

"THE COURT: The Court then accepts your plea of guilty to the charge of Murder In The Second Degree and at this time will defer sentencing as I said until April the 29th. * * * Now, Mr. Pulliam, do you fully understand what we've talked about here this morning about your plea and so forth? Do you have any questions about any of these things that we've talked about? THE DEFENDANT: No, sir. * * *."

At the time of his sentencing, defendant was again represented by Mr. Dobberstein, and the following took place:

"THE COURT: Mr. Pulliam, you are charged with Murder In The Second Degree and you understand this charge that you're charged with? THE DEFENDANT: Yes. THE COURT: And you have entered a plea of guilty to this charge, you understand that? THE DEFENDANT: Yes. THE COURT: And you understand that you have a right to a trial by a jury now if you want and you have chose[n] to plead guilty to this charge, is this correct? THE DEFENDANT: Yes, sir.

"THE COURT: All right, the Court now accepts your plea of guilty to the charge of Murder In The Second Degree and by law I must grant you allocution. At this time do you have any legal reason why the Court should not now pronounce sentence upon you? MR. DOBBERSTEIN: There's no legal reason, Your Honor. THE COURT: Well, I want Mr. Pulliam to say so. THE DEFENDANT: No, sir.

"THE COURT: In accordance with your plea of guilty to the charge of Murder In The Second Degree the Court will sentence you to the Missouri Department of Correction for a period of twelve years * * *."

Dr. Nathan Blackman, a psychiatrist, examined Emmett Pulliam in August, 1967, prior to his guilty plea in March, 1968, and in January, 1970, prior to the evidentiary hearing on his motion in January and February, 1970.

Appellant's version of Dr. Blackman's testimony emphasizes the doctor's opinion that defendant was a severely retarded individual who told him he shot his wife "to scare or hush" her, and that at the time of the shooting there was no intent by defendant to "dispose of" her. "It was a frightened, upset, mentally retarded person, reacting to an undue stress." The mental retardation, the degree of suspiciousness, the "dissension in the midst of the hassle" ruled out an intent to kill. The doctor recognized that a mentally retarded person "can communicate with his attorney, he knows the proceedings, but doesn't know them with the kind of subtleness that a more intelligent, sophisticated person would. * * * He understands this is [h]is attorney, this is the attorney of the State, that they are trying to work out the best thing for the community and for him, I believe he is competent. That doesn't mean that he has the same kind of ability to discriminate or discern the goings on in the Court." The doctor was also of the opinion that he observed in defendant a lack of ability to discern the import of changing his plea and that the court was "dealing with an individual with limited intelligence who when a question is tossed at him he looks at the defendant's attorney and says whatever the attorney tells him." When asked whether he thought defendant expected to be paroled or placed on probation, Dr. Blackman felt "He might have done it on the basis of the optimism that I oozed out or perhaps his attorney. In his mind he was certain that he would not be stepped upon as severely as he was." Finally, Dr. Blackman recognized that movant was now, after some time in prison, a "brighter" person and observed, "You are not dealing with a[n] angry predatory that

is going to come out, become upset, but a quiet, dependable person who is being crucified with a marriage that should not *never* have been held * * *." Defendant had convulsions as a child.

Respondent adds to the foregoing, emphasizing additional testimony from Dr. Blackman. The August, 1967, examination of defendant by Dr. Blackman was ordered and conducted at the request of Mr. Dobberstein and the written report of the examination was in evidence. Included in the report was the doctor's opinion that defendant "is able to cooperate with counsel and is competent to stand trial, but at the time of the shooting, because of the distress and panic created by his wife's screaming and her sister's struggling with him he misinterpreted the situation and he became fearful that the two women were screaming against him. I do not believe that he was able to, because of his mental condition at that time, to form an intent to kill his wife." The report characterized defendant as moderately retarded and not suffering from any mental disease or defects which would make him unable to cooperate with counsel. Dr. Blackman's opinions with respect to defendant's fitness to plead and stand trial, and to cooperate with counsel is further shown by the following:

"Q (By Mr. Settich) Doctor, when Mr. Pulliam came into the Court on March 25, 1968, with his attorney and entered a plea of guilty to the charge of murder in the second degree, do you have any opinion as to whether or not Mr. Pulliam's action at that time was voluntary or involuntary? A Voluntary. * * *

"Q Were you of the opinion in August of 1967 that Mr. Pulliam was not suffering from any mental disease or defect that would prevent him from being competent to stand trial? A I so stated. Q You so stated in your report that he was competent to stand trial; is that correct? A Yes, sir. Q Would you also believe that if he was competent to stand trial that he would be competent to enter a plea of guilty? A I presume that he would have an attorney at his side.

"Q Yes. A I talked to that attorney and the attorney understood his degree of limited intelligence. I understood that the plea would be made by the attorney and that he would acquiesce to it.

"Q Did you at any time other than in this report advise Mr. Dobberstein that Mr. Pulliam was not competent to stand trial? A How could I if my statements indicate that he can?"

According to his mother and a sister, movant finished twelve grades of school as a slow student and received a "special diploma," from McCluer High School. He was "pretty good" in the "general handling of things." Another of movant's sisters observed him frequently prior to entry of his guilty plea. "He didn't act insane," and "he knew what he was doing."

The following excerpts from movant's testimony depict his ability to understand and to express himself.

With respect to his children: "My oldest son is in Memphis where he has been for the last three years and the other two is with my mother-in-law, Mrs. Gertrude Pate in Kinloch. * * * I got a chance to visit with them once in Moberly. They have visits there, so I got a chance to visit with them. This was two months ago."

With respect to his prison schooling: "I met a teacher there, English teacher, Mr. Wagner, Robert Wagner, and he seemed to take a great interest in me, because he has seen that I was unlike most of the inmates, they just went to school to get out of working, and I went there to try to increase my education, so aside from the regular daily assignment he would give me assignments to do on my own, which helped me to progress faster."

With respect to his high school: " * * * they had, as the Judge said before, tracks, you know. I was unable to comprehend as fast as the average normal

student, so I was put in a special class and this was a bad thing, because the teacher, it was one teacher, Mr. Robert Mosby, who was the head of the class and he just didn't take any interest in the students that were in there, white and colored, * * * We were just put in one room all day and we would do whatever we liked, so he was just—every year I was promoted. * * * I finished high school with about fifth grade education."

With respect to problems with his wife and sister-in-law: " * * * what started me thinking that she was trying to poison me was because once when she was cooking she had—well, before this, I would say the first incident, I came home from work one night and she had some like pizzas, you know, she said we had some pizzas in the icebox, would I like some, so I ate a bowl of pizzas and after I finished I got in bed and I broke out in a sweat and I became sick to my stomach and this is when I first started thinking that she was trying to poison me. * * * there was two problems. One, she, Dora, was about 18 years old and she was still wetting in the bed, and she was sleeping on the couch and I would come in and there would be an odor and I didn't know where it was coming from at first and one day I was cleaning up and I turned the couch over and it was just soaking wet, you know, and I was disturbed about this. I talked it over with my wife and I talked it over with my mother and I decided that I was going to send her back to her mother. * * * Shortly after my wife started staying with me I would come home from work and there would be cars parked out in front of the house with four and five guys in them and I would go in the house and there would be alcoholic beverage bottles, a stink all over the house, I would ask my wife about it and she would say 'Well, these are Dora's friends. They came to see her.' * * * And shortly after that my wife just started going to extremes with staying out late at night and with no explanation as to where she was. * * * I was up-

set simply because by her keeping late hours and so forth she was neglecting her duties as a wife, to maintain a decent household and take care of the kids."

With respect to the shooting: "Dora was there by herself and I asked her where my wife and kids were and she said she didn't know, so I took a bath and changed clothes and it was about 12:00 then, I went to the Threaded Needle and to several other clubs where I thought she might be. * * * I came back home, took off my clothes and went to bed. * * * The kids screaming woke me up. * * * My wife was pushing them home in a stroller, her and the babysitter. * * * I got up and I went to the door and let them in. I was upset because the kids stayed sickly and with a cold and me and my wife argued. * * * I told the babysitter that I would take her home and I told my wife I would like for her to go along because I would like to talk to her. I took the babysitter home and I took my wife on Evelyn, which was a dark street, you know, a place where I felt we could be alone and I talked and she agreed to stop keeping such late hours and to try to be a wife to me, so after the conversation we went back to my house on Courtney and as I pulled in the driveway she just started screaming for no reason whatsoever and her sister ran out of the house and jumped in it, I would say in the tussle, because my wife had grabbed hold of me and I was opening the door and her sister came and grabbed me. * * * I had stepped out of the car and was struggling with her sister, Dora, and my wife had locked the door, rolled up the windows and said she was going to wreck the car and she was crying, so I told her, I said, 'Give me the keys so I can go in, I'm tired, I don't feel like'—you know, so she said 'If you want the car keys, shoot the window out.' She knew I had my pistol in my pocket at this time and I told her no, I didn't want to do that, so I picked up a brick which was lying on the ground and broke the window out and reached for my car keys. When I did this she stepped on

the accelerator and I snatched my hand out just in time and her sister was pulling on me and that's the last I remember. * * * The next thing I remember, it was just like a nightmare, coming out of a dream or something, I remember standing over my wife with the revolver in my hand and when I come to myself I looked down at my wife and realizing what must have happened I turned and ran to my mother's house and sent help back."

With respect to his guilty plea: "I didn't want to plead guilty. I was advised to by my attorney and I was also made aware that there was a bargain between my attorney, Mr. Paul Dobberstein, and the prosecuting attorney to give me parole if I accepted, if I entered a plea of guilty and accepted a 12 year term. * * * Q Did you also understand at the time that you entered this plea of guilty that you could have remained with your plea of not guilty and gone to trial and had a trial by a jury. Did you understand that at the time? A Yes, I understood that."

With respect to what he told the police: "I told them everything that I remembered that happened and my mistake was, I was interrogated, as I said, and my mistake was that I felt that I had to make up something to fill in for the time that elapsed in the time that she pulled off up until the time the trigger was pulled, which I didn't know anything about, so I made up what at that time seemed to me to be something that would make me look innocent, which I knew I was innocent of murder, because I didn't remember pulling the trigger. * * * I told the police that I ran after the car and fired a shot in front of the car which I believed went through the vent window in the front of the car and even this was hard for them to believe. They said, how could you catch up with a car that is already took off in front of you and I had no statement, you know."

Paul Dobberstein, Jr., felt his client had a good chance for probation but denied advising he would receive probation if he pleaded guilty. "I advised him that after the plea of guilty that he would go over to the Probation Office on Big Bend Avenue, he would make an application there for probation and an investigation would be conducted and that the Judge would ultimately decide whether or not the [sic] got the probation." He was familiar with Dr. Blackman's report prior to, and at the time his client pleaded guilty, and he discussed its contents with his client. He also discussed the right to trial by jury.

The court, in connection with the denial of relief, filed the following findings of fact and conclusions of law:

"That petitioner was legally capable of entering a plea of guilty and did understand said plea and that said petitioner was not by reason of insanity at such time incapable of entering said plea of guilty.

"That the Court did order petitioner examined by Doctor Nathan Blackman at the request of petitioner's attorney, Mr. Paul Dobberstein, and said psychiatric examination was made and the said psychiatrist testified that while petitioner had a limited education, he had sufficient knowledge and intelligence to form the intent necessary to constitute Second Degree Murder.

"That in addition to petitioner the Court heard testimony of Doctor Blackman, Mr. Fred Gossom, Attorney at Law, and Mrs. Ella Mae Lauderdale, sister of petitioner, and concluded from all evidence that petitioner's plea of guilty was voluntary and not induced by fraud, misrepresentation and persuasion.

"Wherefore, this Court found no evidence to justify vacating, or to set aside or correct judgment and sentence."

■ Appellant contends that the court erred in the findings, conclusions, and judgment "because * * * there was no showing that the defendant understood his plea of guilty" (8f); and "because the defendant was unable to form the intent necessary to constitute second degree murder

and * * * could not and should not have pleaded guilty to such a charge" (8g). The evidence and proceedings have been detailed because they demonstrate ample basis for the court's findings, conclusions and judgment in both respects, and that they are not "clearly erroneous." Rule 27.-26; Crosswhite v. State, Mo., 426 S.W.2d 67.

Appellant asserts it was error for the court to accept defendant's guilty plea without an affirmative showing it was an intelligent and voluntary plea (Boykin v. Alabama, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274); that a guilty plea cannot be truly voluntary unless the defendant possesses an understanding of the facts, and has not been induced to plead on the basis of false hopes or ill-founded expectation of lenience (McCarthy v. United States, 394 U.S. 459, 89 S.Ct. 1166, 22 L.Ed.2d 418). The thrust of his argument is that the court, in accepting the guilty plea, never determined if defendant knew the elements of the crime charged; that the court merely received "yes" answers to general questions; and that defendant was not aware of what was transpiring. By way of support he cites State v. Roach, Mo., 447 S. W.2d 533, and State v. Reese, Mo., 457 S. W.2d 713, which he asserts stand for the proposition that "because a guilty plea is an admission of all the elements of a criminal charge, it cannot be truly voluntary unless the defendant possesses an understanding of the law in relation to the facts."

■ A more accurate statement of the asserted proposition is that a plea of guilty is a confession in open court, and should be received with caution and only if freely and voluntarily made with understanding of the nature of the charge. State v. Roach, supra, 447 S.W.2d 1. c. 556 [2]; State v. Reese, supra, 457 S.W.2d 1. c. 717 [1]. More important, those authorities are distinguished from this case on their facts. In the first, the record indicated clearly that at the time he was arraigned Roach

had reason to believe he would be granted probation if he pleaded guilty. State v. Roach, supra, 447 S.W.2d 1. c. 557 [9]. In the second, other than being asked if it was his desire to plead guilty, the transcript of proceedings was silent as to any other efforts to determine if Reese's plea was voluntarily made. State v. Reese, supra, 457 S.W.2d 1. c. 715.

■ On the issue whether an accused is competent to stand trial or to plead, "the 'test must be whether he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him.'" Dusky v. United States, 362 U.S. 402, 80 S.Ct. 788, 789, 4 L.Ed.2d 824; Wolf v. United States, 10 Cir., 430 F.2d 443, 444 [1].

The testimony of movant's psychiatrist, Dr. Blackman, was that defendant was able to cooperate with counsel and was competent to stand trial. The doctor's report depicted defendant as moderately retarded, but showed him free from any mental disease or defect which would render him unable to appreciate his situation. Doctor Blackman stated unequivocally that in his opinion defendant's action at the time he pleaded guilty was voluntary. In taking the plea, the court determined defendant's understanding of the charge, his desire to change his plea and understanding of such act, his freedom from drug or alcohol influence, that he knew what he was doing, his desire to waive jury trial, his opportunity to discuss his situation with family and counsel, his understanding of the facts constituting the offense as related by the prosecuting attorney, and his understanding that there as no commitment "either way" with respect to probation. True, it is said that such understanding was determined upon automatic "yes" responses to questions from the court; however, the excerpts from movant's own testimony provide ample evidence of defendant's ability to understand and to articulate answers of

substance beyond simple "yes" or "no" responses. The doctor's testimony, although containing an opinion that defendant was unable to form an intent to kill his wife, never suggested any insanity or mental disease or defect that would render him unable to form such intent or to plead voluntarily and with understanding. Movant's sisters and mother, also articulate in their testimony, stated that defendant was not insane, and his own description of the circumstances surrounding the killing shows thought and preparation leading to the shooting. Finally, defendant was represented and advised by counsel whose competence and effectiveness he does not question, and it was through counsel's efforts that defendant was examined for purposes of any defense that might exist by virtue of his mentality.

 Thus, the evidence shows ample factual basis for the court's findings, conclusion and judgment; and with the evidence in such posture, applicable case law shows ample legal basis for the court's conclusions of law and judgment. E. g., that an accused may be mentally retarded in some degree does not automatically render him incapable of standing trial or entering a voluntary plea of guilty, Evans v. State, Mo., 467 S.W.2d 920, 923; State v. Lowe, Mo., 442 S.W.2d 525, 529–530; that a guilty plea may result from bargaining does not deprive it of its voluntary character, Ford v. United States, 8 Cir., 418 F.2d 855; that a plea need not be founded on an admission of guilt to be voluntary, North Carolina v. Alford, 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162, that the question of defendant's competence to know the nature of proceedings against him is one of fact for the trial court in a Rule 27.26 proceeding, State v. Roark, Mo., 438 S.W.2d 508, 511 [1].

The rule of Boykin v. Alabama, supra, has no application to this case because the record shows movant's plea was entered voluntarily; and even if McCarthy v. United States was applicable to this case, the court disabused defendant of any false hope of probation in the course of the plea proceedings.

Judgment affirmed.

WELBORN, C., concurs.

PER CURIAM:

The foregoing opinion by HIGGINS, C., is adopted as the opinion of the court.

HOLMAN, P. J., SEILER, J., and COTTEY, Special Judge, concur.

BARDGETT, J., not sitting.