Johnny Lee WILSON, Movant–
Appellant,

v.

STATE of Missouri, Respondent.

No. 73285.

Supreme Court of Missouri,
En Banc.

July 23, 1991.

Rehearing Denied Sept. 10, 1991.

---

William J. Swift, Columbia, for movant-appellant.

William L. Webster, Atty. Gen., Elizabeth L. Ziegler, Asst. Atty. Gen., Jefferson City, for respondent.

Charles W. German, M. Elizabeth Kirkland, Kansas City, and James W. Ellis, and Barbara E. Bergman, Albuquerque, N.M., for amicus American Ass'n of Mental Retardation.

HIGGINS, Senior Judge.

Johnny Lee Wilson pleaded guilty April 30, 1987, to first degree murder, and the trial court, the Honorable L. Thomas Elliston, Judge, sentenced Wilson to life imprisonment without eligibility for probation or parole pursuant to Wilson's plea agreement. Judgment was entered accordingly. Wilson filed a motion to vacate the judgment pursuant to Rule 24.035. After an evidentiary hearing, the motion court, the Honorable C. David Darnold, Judge, denied Wilson relief and entered judgment accordingly. Wilson appealed from that judgment. The Court of Appeals, Southern District, affirmed. This Court then granted transfer. Affirmed.

## I.

■ Wilson commenced this proceeding by filing an unverified *pro se* Rule 24.035 motion June 17, 1988. Pursuant to Rule 24.035(e), the motion court appointed counsel June 29, 1988, to represent Wilson. Counsel requested an extension of thirty days in which to file an amended motion, which the court granted July 28, 1988. Counsel timely filed a verified amended Rule 24.035 motion August 26, 1988. Whether the motion court had jurisdiction over Wilson's post-conviction proceedings when a timely filed, properly verified, amended motion was filed subsequent to the filing of an unverified *pro se* motion is an issue of first impression before this Court. Because the sole deficiency in the *pro se* motion, the absence of verification, was remedied by a timely filed, verified, amended motion that presented the claims litigated in this proceeding, the purpose of the verification requirement was satisfied in this case. *See Kilgore v. State,* 791 S.W.2d 393, 395 (Mo. banc 1990). This Court finds that the motion court had jurisdiction to proceed on the amended motion.

## II.

Wilson advances three grounds for relief. He argues the motion court erred in denying him relief because the State failed to make available allegedly exculpatory evidence during the post-conviction proceeding; he contends the motion court erred in finding his guilty plea was voluntarily given; and he asserts ineffective assistance of his post-conviction counsel.

■ At the outset, this Court disposes of pending motions that were taken with the case. Wilson's Motion to Strike Copies of Respondent's Exhibits A–H and L–M and Motion to Deem as Before This Court in its Entirety the Transcript of Competency and Suppression Proceedings are sustained. His Motion to File a Substitute Verified Pro Se 24.035 Motion and Motion to Supplement the Record on Appeal, or in the Alternative, to Remand to the Circuit Court For a Hearing on Newly Discovered Evidence, filed with this Court on the morning of oral argument, are overruled. The subject matter of the latter motion, purported admissions by Chris Brownfield of responsibility for this crime, has no bearing on the voluntariness of Wilson's guilty plea, particularly under the motion court's finding that those statements that were before it were not credible and the cases holding that Missouri's post-conviction relief rules are not a proper vehicle for the examination of claims of newly discovered evidence. *See State v. Mims,* 674 S.W.2d 536, 539 (Mo. banc 1984); *Westmoreland v. State,* 594 S.W.2d 596, 598 (Mo. banc 1980); *Beishir v. State,* 480 S.W.2d 883, 885 (Mo. 1972). The sole purpose of this post-conviction proceeding is to determine whether the proceedings that led to Wilson's conviction were violative of any constitutional requirements or if the judgment of conviction is otherwise void. *Fields v. State,* 572 S.W.2d 477, 480 (Mo. banc 1978); *Wright v. State,* 459 S.W.2d 370 (Mo.1970); *Loewe v. State,* 778 S.W.2d 331, 333 (Mo.App.1989). This proceeding is not the proper vehicle for relitigating Wilson's guilt or innocence. *Fields,* 572 S.W.2d at 480. Newly discovered evidence, if available, may better serve Wilson in a Petition for a Writ of Habeas

Corpus under Rule 91, *see White v. State*, 779 S.W.2d 571, 573 (Mo. banc 1989), in a Motion to Withdraw Guilty Plea under Rule 29.07(d), or in a request for a pardon from the governor under the Missouri Constitution. *See State v. Warden*, 753 S.W.2d 63, 64 n. 2 (Mo.App.1988), *citing Whitaker v. State*, 451 S.W.2d 11, 15 (Mo.1970). Wilson also contends the State failed to make available allegedly exculpatory evidence in the Rule 24.035 proceeding. Such evidence surfaced subsequent to Wilson's guilty plea. As previously noted, this newly discovered evidence was not cognizable in the post-conviction proceeding; hence, the motion court properly denied Wilson relief on this ground.

■ This Court's review of the motion court's denial of post-conviction relief is not a de novo review; rather, the findings of the motion court are presumptively correct. *See Crosswhite v. State*, 426 S.W.2d 67, 70 (Mo.1968). This Court's review is limited to whether the findings, conclusions and judgment of the motion court are clearly erroneous. Rule 24.035(j). Such findings and conclusions are deemed clearly erroneous only if, after reviewing the entire record, this Court is left with "the definite and firm impression that a mistake has been made." *Day v. State*, 770 S.W.2d 692, 695–96 (Mo. banc 1989), *citing Sanders v. State*, 738 S.W.2d 856, 857 (Mo. banc 1987).

■ Wilson contends the motion court erred in finding his guilty plea was voluntarily given. He argues his mental retardation prevented him from consulting with his attorneys "in a meaningful fashion" regarding his waiver of the constitutional rights and protections that accompany a trial. As this Court stated in *Wilkins v. State*, 802 S.W.2d 491, 502 (Mo. banc 1991), "[a] finding of competence to proceed to trial is tantamount to a finding that one is competent to enter a plea of guilty." To be competent to plead guilty, Wilson had to have a sufficient present ability to consult with his attorneys with a reasonable degree of rational understanding and had to have a rational and factual understanding of the proceedings against him. *Dusky v.*

*United States*, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960); *Brown v. State*, 485 S.W.2d 424, 429 (Mo.1972); *Pulliam v. State*, 480 S.W.2d 896, 903 (Mo.1972). Some degree of mental retardation does not automatically render him incapable of entering a voluntary plea of guilty. *Id.* at 904; *State v. Lowe*, 442 S.W.2d 525, 529–30 (Mo.1969). Whether Wilson understood the nature of the proceedings against him and had a sufficient present ability to consult with his attorneys in this case was one of the issues properly before the motion court for determination. *Martin v. State*, 558 S.W.2d 701, 704 (Mo.App.1977).

Wilson grounds his contention of motion court error in the confluence of his "impaired developmental history, [his] actions on the day at issue, the police investigation, the competency proceedings and Judge Elliston's conduct therein when reviewed in light of [Wilson's] responses and lack of responses at the plea hearing and Chris Brownfield's admissions of responsibility." Wilson contends this Court must determine whether his plea was voluntary by analyzing those factors under the "totality of the circumstances" standard that the petitioner sought to be applied in *Henderson v. Morgan*, 426 U.S. 637, 644, 96 S.Ct. 2253, 2257, 49 L.Ed.2d 108, 114 (1976). Wilson's reliance on *Henderson* is misplaced, however, because the U.S. Supreme Court did not adopt that standard; rather, the court held that "a plea cannot support a judgment of guilt unless it was voluntary in a constitutional sense" and noted that:

> A plea may be involuntary either because the accused does not understand the nature of the constitutional protections that he is waiving ... or because he has such an incomplete understanding of the charge that his plea cannot stand as an intelligent admission of guilt. Without adequate notice of the nature of the charge against him, or proof that he in fact understood the charge, the plea cannot be voluntary in this latter sense.

*Id.* (citations omitted). The defendant in *Henderson* had not received notice of all the elements of the crime to which he pleaded guilty. Wilson, however, was ad-

vised of all the elements of the offense with which he was charged, and the defendant's mental retardation in *Henderson* played no part in the court's decision.

The trial court conducted a mental competency hearing April 15, 1987, and found Wilson competent to proceed to trial. The evidence presented at the hearing included a report from Dr. Jayaratna, M.D., the psychiatrist who reported on the mental examination of Wilson at the Fulton State Hospital; the testimony and report of Dr. Foster, Ph.D., a psychologist who reviewed and analyzed Jayaratna's psychological testing and results; and the testimony and report of Dr. Logan, M.D., a psychiatrist who conducted a mental examination of Wilson subsequent to Jayaratna's examination. The trial court, after conducting a guilty plea hearing April 30, 1987, also found Wilson competent to plead guilty. Based upon the record created by those two hearings and Wilson's testimony and conduct before the motion court, the motion court found:

> that movant does have a mental defect, but even with the mental defect, he was able to assist counsel in his defense, understood the proceedings against him, and was able to assist in his own defense and evaluate the various options open to him in addition to pleading guilty. The court further finds that movant's plea of guilty was made voluntarily and intelligently, with a full understanding of the charge and consequences of the plea and with an understanding of his rights attending a jury trial and the effect of a plea of guilty on those rights.... Movant has failed to sustain the burden of proof that movant's plea of guilty was not knowingly, intelligently and voluntarily made with a full understanding of his constitutional rights and the effect of a plea of guilty.

## A. The Competency Hearing Record

■ The record from the competency hearing supports the motion court's conclusions. Jayaratna's report specifically found Wilson had the capacity to understand the proceedings against him and was capable of assisting his attorneys in his own defense:

> When questioned about his charges, he appeared to possess a good understanding of the criminal charges as they are brought against him, and is aware of the possible penalty if he is convicted of the alleged charge. He also possessed a good understanding of the nature, object, and principles of the courtroom proceedings. He was aware of his situation with the court and was aware he is being represented by an attorney. He was able to discuss his legal status in a reasonable and coherent fashion. He appeared to be capable of interpreting a witness' testimony and should be able to testify in his own defense if called upon to do so. The defendant appeared well able to advise his counsel and to cooperate with the court in his own best interest if he so chooses. He also gives the impression he is unlikely to decompensate in terms of his capacity to appreciate reality or direct his behavior in a goal-directed fashion during the trial proceedings.

The psychological tests performed on Wilson revealed he had a verbal IQ of 69, a performance IQ of 89, and a full scale IQ of 76. Although two experts, Foster and Logan, opined that Wilson was not fit to proceed, both conceded that Wilson knew right from wrong; Logan admitted that Wilson understood the charges against him and the roles of defense counsel, the prosecuting attorney, the judge and the jury; and Logan asserted that Wilson was fit to proceed to trial if he were being tried for stealing $151.00. Logan and Foster acknowledged that their combined amount of time spent conferring with and observing Wilson was less than twelve hours; the staff at Fulton State Hospital spent four weeks with Wilson.

## B. The Guilty Plea Hearing Record

At the guilty plea hearing, the trial court undertook a punctilious inquiry into Wilson's motives for pleading guilty and whether he was being forced to enter the guilty plea. Wilson points to three of the thirty pages of the guilty plea hearing tran-

script to argue that throughout the hearing he merely took cues from the judge and, due to his dependent personality, answered all the judge's questions the way he thought the judge wanted him to answer. Nevertheless, Wilson varied his answers from affirmative responses to negative responses and from short observations to lengthy comments. In an attempt to make the proceeding as simplistic and understandable as possible, the trial court interposed several one-issue questions meriting "yes" or "no" answers and repeatedly cautioned Wilson to alert the trial court or his attorneys if he did not understand a question. Wilson stated during the hearing that he was charged with first degree murder and that the possible penalties for the charge were life imprisonment or the death penalty; he stated the names of the three attorneys who represented him; he inquired whether he could serve his sentence at the Fulton State Hospital rather than in the penitentiary; he asked the trial court to repeat a question and let the trial court know he did not understand certain questions; he stated that the initials in the margin of the plea bargain petition were his; he described his actions at the hearing as "to plead guilty and to waive the death penalty;" and he corrected the prosecution's version of the facts underlying his guilty plea.

The transcript of the guilty plea hearing sets forth the painstaking efforts of the trial court to ensure Wilson understood the plea agreement and was offering it voluntarily and knowingly. This Court draws freely from the opinion written by the Honorable John E. Parrish for the Southern District Court of Appeals in analyzing the record of the guilty plea hearing. At the outset of the guilty plea proceeding, the trial court stated its understanding that Wilson was appearing for purposes of withdrawing a plea of not guilty and entering a plea of guilty. The trial court inquired of Wilson whether the court's understanding that Wilson wished to withdraw his plea of not guilty and enter a plea of guilty was correct. Wilson answered that it was. Wilson was then placed under oath. He answered preliminary questions about his

age and schooling, then responded to other questions with some uncertainty. Wilson answered an inquiry whether he knew "what you're doing this morning, or this afternoon, it is afternoon?" He responded, "Uh, yes, not really." After the trial court explained that it was necessary that he assure that Wilson has "absolutely no doubt ... about what's happening," the trial court told Wilson to tell him if Wilson did not understand any words used. Wilson was told that the trial court would explain the words to Wilson or give the attorneys an opportunity to explain them. The trial court again stated its understanding that Wilson was present "to enter a plea of guilty." The trial court reiterated the basis of the anticipated plea stating, "Now it's my understanding that you're not wanting to admit your guilt, you understand ... that you could very possibly get the death penalty imposed upon you if you had a trial in this case." Wilson was then asked, "Now, what's your understanding of why you're here this afternoon?" Wilson answered, "Plead guilty."

A series of questions and answers followed in which, when asked why he was pleading guilty, Wilson stated "I don't know;" then, responding to the question, "Do you want to enter a plea of guilty," Wilson answered, "Yes." After Wilson again responded, "I don't know," to the question of why he wanted to plead guilty, a series of specific questions were asked and answered as follows:

Q [by the trial court]: Do you know that the death penalty is a possibility in this case?

A [by Wilson]: Yes.

Q: Do you want the death penalty?

A: No.

Q: Do you want to avoid the death penalty?

A: Yes.

Q: Are you admitting that you committed this murder?

A: Yes.

Q: Why don't you tell me, Johnny, just explain to me what happened and what went on here, and then I'm going to talk to you some more. I have to

make sure that you know and understand what your rights are and that you're entering this plea freely and voluntarily. If I can't determine that in my own mind, I cannot accept a guilty plea, and I have to force you to a jury trial then, and the death penalty's a possibility, so I've got to make sure you know and understand what you're doing. Why don't you tell me in your own words, just talk to me a little bit. Tell me what happened here, and, and what you did and why you want to plead guilty, why you're wanting to avoid the death penalty? Just tell me everything you can about this.

A: I don't understand what you're saying.

Q: Well, you told me that you were guilty of this murder. Are you guilty of this murder?

A: Yes.

Q: Do you want to avoid the death penalty?

A: Yes.

Q: Is that why you're wanting to plead guilty is because the State has agreed that if you plead guilty, they won't seek the death penalty?

A: Yes.

Q: All right, why don't you tell me in your own words why you think you're guilty of this murder?

A: I'm guilty, I guess.

Wilson suggests that the equivocation on his part discloses that he did not and could not understand the guilty plea proceeding and was, therefore, not capable of entering an intelligent and knowing plea of guilty. It is necessary, however, as this Court stated in *Day*, 770 S.W.2d at 695–96, and in *Sanders*, 738 S.W.2d at 857, to look at the whole record that was before the motion court in determining the voluntariness of Wilson's plea of guilty, including whether it was given knowingly and intelligently, rather than to limit the review of Wilson's responses to a few questions and answers taken out of context from the other inquiry that occurred. "Rule 24.02 requires that before accepting a plea, a court must determine the plea is voluntary and imposes a

procedure or ritual to be followed. However, 'the detail of ritual was meant to subserve the reality of a basis in fact for the offense charged to which the pleader accedes with a free will and with understanding.'" *Crowe v. State*, 774 S.W.2d 900, 901 (Mo.App.1989), *quoting Branstuder v. State*, 609 S.W.2d 460, 462 (Mo.App. 1980). "Whether or not a motion under Rule 24.035 should be sustained, must be determined upon the basis of the whole record, including the plea transcript." *Crowe*, 774 S.W.2d at 901.

Inquiry of Wilson continued at considerable length. The inquiries by the trial court and Wilson's responses included his acknowledging that he had been present at an earlier suppression hearing at which the state presented some of the evidence it had against him; that he believed that evidence would convict him of murder; and that the evidence "might also convince a Jasper County jury to impose the death penalty" upon him. Wilson was again asked, "Did you do those things that we heard about in the evidence …?" He replied, "Yes." The trial court then inquired and Wilson answered as follows:

Q: So, I'm going to be asking you many questions. Johnny, you're here with some attorneys this afternoon, are you not?

A: Yes

Q: Can you tell me the names of these attorneys?

A: Victor Head and Michael Garrett and Carr Woods.

Q: Have you had time to talk to these attorneys about your case?

A: Yes.

Q: Have you spent quite a bit of time talking to them about your case?

A: Yes.

Q: Have you told them everything you possibly could about your case?

A: Yes

Q: Are you satisfied with their services to you, Johnny?

A: Yes.

Q: Have any of them done anything concerning your case that you did not want them to do?

A: No.

Q: Have any of these attorneys failed or refused to do something concerning your case that you wanted them to do?

A: No.

Q: Are they in any way forcing you to enter this plea of guilty this afternoon?

A: No.

Q: Johnny, we've already talked about it, but just where the record's clear, do you understand what you're charged with in this case?

A: Yes.

Q: What's the name of that charge?

A: First degree murder.

Q: Do you understand what the possible penalties are for that?

A: Yes.

Q: What are the two possible penalties for that charge?

A: Life imprisonment or the death penalty.

Q: That's correct, Johnny. Now, also, if this went to trial, there's a possibility that there might be other instructions given on second degree murder and also on manslaughter. That's a possibility. Of course, second degree murder, the maximum is life. Manslaughter, in this case, the maximum would be ten years. Do you understand that it is, there's a chance, however slim it might be, it is possible that those instructions might be given, and you might be found guilty of what's called a lesser included offense? In other words, you might be found guilty of, uh, murder in the second degree, or you might be found guilty of manslaughter. Do you understand that there is that slim chance or that chance—

A: Yes.

Q: —that lesser included offenses would be given here? But you also understand that if you have a jury trial, there's also a chance that you would be found guilty of murder in the

first degree and be given the death penalty? Do you understand that?

A: Yes.

Q: Now, you told me that these attorneys were not forcing you to enter this plea of guilty. Is there anybody in any way forcing you to enter this plea of guilty?

A: No.

Q: Have you talked to your mother and your grandmother about this?

A: Yes.

Q: Have you talked to other people about entering this plea other than your attorneys and your mother and grandmother?

A: No.

Q: But those, those are the closest people to you, isn't it Johnny?

A: Yes.

Q: And you've lived all your life with your mother and your grandmother?

A: Yes.

Q: And, of course, these attorneys have been very close to you during this case, have they not?

A: Yes.

Q: Have they spent a lot of time with you?

A: Yes.

Q: Is there anybody else that you want to talk to before you enter this plea of guilty?

A: No.

Q: Is your mother or grandmother in any way forcing you to enter this plea of guilty?

A: No.

The trial court continued its meticulous inquiry into Wilson's understanding of what would transpire if the case were tried before a jury and whether Wilson understood the rights available to him with respect to calling witnesses, cross-examining witnesses called by the State, and explaining the panoply of rights that extend to defendants who are accused of criminal acts. Wilson responded that he understood these rights.

The trial court then turned to the matter of the role of a jury in a first degree

murder trial. After again cautioning movant "if there's anything that happens this afternoon that you have any questions about at all, let me know, and I will explain it to you or I will give your attorneys an opportunity to explain it to you," the trial court asked if Wilson understood "that at a jury trial, all 12 members of the jury would have to find you guilty beyond a reasonable doubt" before he could be found guilty. Wilson answered, "Yes." The following then occurred:

Q: Do you understand that also, at a jury trial for first degree murder, in a separate part of the trial, all 12 members of that jury would have to find that you should be given the death penalty before you could be given the death penalty?

A: No.

Q: Well, the trial of a first degree murder case is actually in two parts. First, we would have a trial, and we would submit to the jury or let the jury decide whether you were guilty or innocent of first degree murder. If they found you guilty of first degree murder, then I would give them, the court would give them further instructions, and further evidence would be presented and arguments would be made by the attorneys, and the jury would go back out, and then they would decide whether or not you should be put to death. Do you understand my explanation of that?

A: Yes.

Q: Do you understand that when they went back out the second time to decide whether or not you should be put to death, all 12 of them would have to decide that you should be put to death before the jury could fix that punishment?

A: Yes.

Q: Do you understand, however, that if all 12 of them could not decide whether it should be death or whether it should be life imprisonment, if they just simply could not decide after due deliberations, that the duty would then fall upon me to decide whether you should

be put to death or be sentenced to life in prison. Do you understand that?

A: Yes.

The trial court then explained in detail that if Wilson pleaded guilty there would be no further trial to determine his guilt or innocence; that Wilson, without further trial or hearing, would receive as punishment life in prison; that if Wilson pleaded guilty under those circumstances, he could not later change his mind and obtain a trial. After each facet was explained, Wilson was asked if he understood. Each time he answered, "Yes." Again, the trial court asked, "[U]p to this point, is there anything at all that you have any questions about?" Wilson responded, "I just wondered if there's any chance at all if I could be, get life in Fulton State Hospital and, 'cause I'm scared to death to go to the penitentiary." The trial court explained that he did not control where Wilson would be placed; that the trial court would not be entering any order for Wilson to go to Fulton State Hospital; that Wilson's placement and the decision as to whether treatment would be provided for Wilson's mental condition would be determined by the Department of Corrections. The trial court then asked Wilson if his questions were answered; whether he understood that the trial court was giving him no assurances of anything concerning prison; that the trial court gave no assurance that Wilson would go to Fulton State Hospital. The trial court stated, "I'm telling you that I have no control over those factors." Asked if he understood that, Wilson answered, "Yes."

Wilson had filed a four-page Petition to Enter Plea of Guilty Pursuant to North Carolina v. Alford with the court. Three of the paragraphs and an attached Memorandum of Plea Bargain declare that Wilson's reason for pleading guilty was that he believed there was enough evidence to convict him "regardless of any defense he might raise," that if he were convicted, he might be sentenced to death, and that "[i]n return for [Wilson's] plea of guilty ... the State has agreed to waive the death penalty, so that [Wilson] will be sentenced to life imprisonment without the possibility of probation, or parole, or release, except by the act

of the governor." After reviewing this petition with Wilson, the trial court discussed with Wilson his understanding of the negotiated plea agreement pursuant to which he was tendering his guilty plea. The trial court asked:

Q: Johnny, if I understand you correctly, there's been some plea bargain or some agreement made and entered into in this case between you and your attorneys and the Prosecutor. Now, we've mentioned it at various times here since I've been talking to you, but I want you to tell me as best you can what you understand that plea bargain to be?

A: Plead, to plead guilty and to waive the death penalty.

Following additional questioning of Wilson, the trial court inquired of the prosecuting attorney, "For the record, Mr. Prosecutor, would you give us a brief statement of what you feel the facts would be in this case?" The prosecuting attorney responded with the following:

Yes, Your Honor. The State's evidence would be that on April 13, 1986, in Aurora, Lawrence County, Missouri, uh, the Defendant, uh, went to the home of Pauline Martz with a gas container, some rope, and duct tape, that, uh, she was alone in her residence at that time. Uh, the Defendant was familiar with her. She had been a friend of his grandmother's and visited in the home, that he knew her. That he went in the house, that as I said, she was alone. She was near the kitchen area. Uh, he looked around in the house and determined that she was, in fact, alone. That, uh, they, uh, that he grabbed her, uh, bound her hands at the wrists, uh, and her feet near the ankles with rope and tape. That, uh, there was on, sometime during the struggle, he punched her in the chest. Uh, that the evidence would further show that he poured the gasoline around her body in the solarium room in the, uh, corner of the house, that she was on the floor bound and gagged, had tape over her mouth, and that he poured, also had some papers that were scattered in the house. That fluid, that gasoline or flammable fluid was poured around her, ran back through, uh, the bedroom part of the house, down a hallway, that he ignited this and left.

Uh, the evidence would be that he, uh, ran back home, took the can with him, uh, got back in his bedroom through means of, uh, an exit, uh, a door that could, uh, be opened without going through the remainder of the house where no one else would be alerted. That he got back in his room, lay down. Uh, that his mother was listening to the scanner, heard the fire engines, and, uh, called that there was a fire at the Pauline Martz residence, asked if he would go over with her and, uh, see what was going on, that he and his mother rode over to the scene of the crime, and, in fact, the house was in blazes then. Uh, evidence would show that, uh, Defendant made admissions at the scene to, uh, to an individual, uh, that he knew that he was involved in the crime, that, uh, that he had tied Ms. Martz up, bound her, gagged her, set the house on fire. That he heard a scream and became very nervous, because he thought that she might be alive and might identify him.

The evidence would be that he and his mother returned home, uh, that an investigation was conducted. Uh, the Defendant stopped in the Aurora Police Station, uh, during this investigation to pick up a billfold that he had lost at the Aurora Theater, that, uh, that officers questioned him regarding his involvement. He did, in fact, admit to it. Uh, that he admitted to details which, uh, were known only by him at that time. Uh, there was a search warrant and a search, consent to search of residence he lived. The gas container was discovered there. Underwear believed to be from the victim, Pauline Martz, was found there in his room. And, uh, the State believes that all that evidence would be admissible during the trial and would, that the Defendant would be convicted of this crime based on that evidence.

After further discussion between the trial court and respective counsel, the trial court again addressed Wilson:

Q: Johnny, do you have anything that you feel should be added to the statement of the facts or the evidence that the State said that they could produce against you?

A: Just one thing, Your Honor. Uh, as [the prosecuting attorney] said, I, I did not walk into the police department of my own free will. Art Owens came down to the Princess Theater and got me out and took me down to the police station.

Q: All right. Anything else?

A: No.

The trial court then, once again, inquired of Wilson whether he wished to plead guilty; whether anyone was forcing him to plead guilty; whether he was guilty of first degree murder; the basis for his plea of guilty ("to avoid the possibility of the death penalty"); and whether he was asking the court to accept the guilty plea. The trial court concluded with the following:

Q: Do you have any questions at all about what's happened this afternoon?

A: No.

Q: Do you have anything else you want to say to me about your guilty plea?

A: No.

The trial court then read his entry in the court file:

THE COURT: All right, I've made this entry up to this point: "Defendant appears in person and with his attorneys, Mike Garrett, Carr Woods, and Victor Head. State appears by Scott Sifferman, Prosecuting Attorney of Lawrence County. Defendant withdraws his plea of not guilty and files Petition to Enter a Plea of Guilty. Defendant sworn and hearing held. The Court finds that the Defendant's plea of guilty is made voluntarily and intelligently, with a full understanding of the charge and the consequences of the plea, and with an understanding of his rights attending a jury trial and the effect of a plea of guilty on this rights. The Court also finds there is a factual basis for the plea. The Court, therefore, accepts the plea of guilty to the charge of First Degree Murder, and

the Court finds the Defendant guilty of that charge. State waives the death penalty. Court does not order a presentence investigation."

Judgement and sentence were then pronounced. The trial court concluded with the inquiry of those present: "Now, is there anybody that has any doubt about the Defendant's fitness to proceed or competency to enter this guilty plea? If so, we need to get it on the record right now?" The transcript reflects that the prosecuting attorney responded, "No, your Honor." It states, "MR. GARRETT: (Mr. Garrett shakes head)"; "MR. HEAD: (Mr. Head shakes head)."

C. The Post–Conviction Hearing Record

The transcript of the motion court's proceeding also supports the motion court's denial of relief. Dr. Logan testified consistently with his testimony during the competency hearing and stated that during his interview with Wilson, Wilson had given him "a version that was consistent with guilt" and that he "initially thought" Wilson committed this crime "and was—under [the] influence of his mother and grandmother ... to change his story." Wilson had no difficulty exhibiting a rational understanding of the questions posed by his post-conviction counsel; he, again, varied his answers from negative responses to affirmative responses and from short observations to lengthy comments during both direct and cross examination. Substantiating the State's theory of Wilson's motive, and corroborating Wilson's confession that he performed "sexual acts" with the victim from "behind," in "the front," and in her mouth, while insisting "I hardly done anything," witnesses testified to Wilson's possession of pornography at home and, in violation of jail rules, while in the Lawrence County jail and to his exposing himself several times to a neighbor. The pictures that he possessed and that are in evidence in this proceeding depict persons performing the explicit acts he admitted performing on the victim. Witnesses also testified that he graduated from high school seventy-fourth out of a class of ninety, that he played chess and other games

while in jail, and that he read adult books while in jail.

### III.

After reviewing the entire record in this case, this Court cannot say that the motion court made a mistake in denying Wilson relief. The trial court and the motion court, after analyzing all the testimony and reports and after observing Wilson aid in his defense during the various hearings, exercised their fact-finding responsibility and discretion in favor of the State's evidence of Wilson's competency; such a credibility call is amply supported by the record. *See Wilkins*, 802 S.W.2d at 501. The trial court's direct questioning of Foster and Logan during the competency hearing focused on the differences in the conclusions of the two psychiatrists who examined Wilson, was properly directed at eliciting precise answers from both experts, was consistent with the requirements for accepting guilty pleas under Rule 24.02, and, contrary to Wilson's argument, was not adversarial or accusatory in nature. In sum, the record in this proceeding demonstrates that both the trial and motion courts granted extensive hearings on all the issues raised before them. Those issues have been resolved with substantial evidence supporting their resolutions, and the resolutions are not shown to be "clearly erroneous." Rule 24.035(j).

■ Wilson argues that his admissions of guilt during the guilty plea hearing, after he had announced his guilty plea as being an *Alford* plea, *North Carolina v. Alford*, 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970), demonstrated a lack of understanding and voluntariness of the plea. An *Alford* plea, however, "stands on equal footing with one in which an accused specifically admits the commission of the particular act charged." *Jenkins v. State*, 788 S.W.2d 536, 538 (Mo.App.1990). Wilson's admission of guilt during the trial court's meticulous inquiry into the voluntariness of Wilson's plea did not render his guilty plea involuntary.

Wilson also asserts ineffective assistance of his post-conviction counsel. Such a

claim is not reviewable in this proceeding. *Lingar v. State*, 766 S.W.2d 640, 641 (Mo. banc), *cert. denied*, — U.S. ——, 110 S.Ct. 258, 107 L.Ed.2d 207 (1989).

The judgment is affirmed.

ROBERTSON, C.J., and RENDLEN, COVINGTON and HOLSTEIN, JJ., concur.

BLACKMAR, J., dissents in separate opinion filed in which SEILER, Senior Judge, dissents and concurs.

BLACKMAR, Judge, dissenting.

After studying the substantial record in this case, including the transcript and tapes of the movant's lengthy interrogation by the police, the report of his examination at Fulton State Hospital, the transcript of the competency hearing, the petition to enter plea of guilty, the transcript of the hearing at which the plea was received, the postconviction transcript, and the findings and conclusions of the postconviction judge, I am left with "the definite and firm impression that a mistake has been made" in not allowing the movant to withdraw his plea of guilty and stand trial. *Day v. State*, 770 S.W.2d 692, 696 (Mo. banc 1989), *cert. denied sub. nom., Walker v. Missouri*, — U.S. ——, 110 S.Ct. 186, 107 L.Ed.2d 141 (1989); *Sanders v. State*, 738 S.W.2d 856, 857 (Mo. banc 1987). My conclusion is based on the documents detailed above. I do not suggest that we should substitute our judgment for that of either the sentencing judge or the postconviction judge as to any question of credibility, or on their evaluation of the expert testimony about the movant's mental condition. The documentary record is such, however, that I would reverse the judgment and remand the case to allow him to withdraw his plea and proceed to trial. We must bear in mind that all the movant is asking for is a trial. The law may not favor new trials, but in the criminal context it does favor trials.

### I. *Was the Guilty Plea Voluntary and Intelligent?*

An accused person may of course waive his right to a trial by pleading guilty. This

waiver meets constitutional standards only if it is voluntarily and intelligently made.[1] The proceedings attending the entry of this guilty plea do not persuade me that these requirements have been met.

Our Rule 24.02 was adopted in deference to constitutional standards. It spells out the minimum scope of the interrogation which must precede the entry of the plea and requires the court to determine whether there is "a factual basis for the plea." *Rule 24.02(e)*. The trial judge's responsibility is not fully discharged, however, simply by proceeding through the litany of the rule, or one of the more elaborate litanies that some trial judges use. These serve a purpose, but the overriding obligation is to determine whether the plea is voluntarily and intelligently made.

Before this plea was received, the sentencing judge conducted a comprehensive hearing on the movant's capacity to stand trial. The determination that he had this capacity is a permissible finding from the record, even though the evidence showed, and both the sentencing and the postconviction courts expressly found, that the movant has a "mental defect." I agree that the presence of a mental defect does not necessarily disable a person from standing trial and would accept the general proposition that a person who has the capacity to stand trial has the capacity to enter a plea of guilty. *Wilkins v. State*, 802 S.W.2d 491, 502 (Mo. banc 1991). But it still must be shown that the plea was voluntarily and intelligently made.

According to Dr. Jayaratna, a staff psychiatrist at Fulton State Hospital:

[t]he results of verbal portions of the Wechsler Adult Intelligence Scale–Revised place Mr. Wilson at the upper limits of the mild mental retardation range, while the results of the performance portions of that test placed him in the dull-normal range, with a full-scale I.Q. in the borderline range of intellectual functioning.

Dr. Logan, a psychiatrist and one of Wilson's expert witnesses, diagnosed Wilson as afflicted with Dependent Personality Disorder, a concept recognized in the Diagnostic and Statistical Manual of Mental Disorders (3d Ed., revised 1987), published by the American Psychiatric Association as an analytical and diagnostic aid to practitioners. The DSM–III describes this personality disorder as follows:

The essential feature of this disorder is a pervasive pattern of dependent and submissive behavior beginning by early adulthood and present in a variety of contexts.

People with this disorder are unable to make everyday decisions without an excessive amount of advice and reassurance from others, and will even allow others to make most of their important decisions....

This excessive dependence on others leads to difficulty in initiating projects or doing things on one's own. People with this disorder tend to feel uncomfortable or helpless when alone, and will go to great lengths to avoid being alone. They are devastated when close relationships end, and tend to be preoccupied with fears of being abandoned.

These people are easily hurt by criticism and disapproval, and tend to subordinate themselves to others, agreeing with people even when they believe them to be wrong, for fear of being rejected. They will volunteer to do things that are unpleasant or demeaning in order to get others to like them.

The evidence of the particular mental defect described by Dr. Logan imposed a special obligation on the trial court to make sure that the movant understood what he was getting into and voluntarily entered his plea with this understanding. I find no indication that the sentencing judge rejected Dr. Logan's diagnosis, as distinguished from his conclusion on movant's capacity to stand trial. The court's finding of mental defect, indeed, seems to confirm the diag-

---

1. *Rule* 24.02(c); *see also Boykin v. Alabama*, 395 U.S. 238, 242, 89 S.Ct. 1709, 1711, 23 L.Ed.2d 274 (1969), and cases cited therein.

nosis. The diagnosis is all the more important because the movant denied commission of the offense when speaking with a psychologist who gave expert testimony, and vacillated from admission to denial in his interview with Dr. Logan. He had also denied guilt in an interview with the psychiatrist at Fulton, and in response to the "I regret" blank on a writing ability test, wrote "confessing to something i did't (*sic*) do."

In determining whether there was a factual basis for the plea the trial court was obliged to consider the movant's taped statement to the police which, in transcribed form, covers more than 100 double-spaced pages. A voluntary admission of the crime, of course, would be the strongest possible demonstration of factual basis for a plea of guilty. The movant was subject to a skillful and aggressive interrogation by a professional investigator. He initially denied any connection with the offense. The interrogator then led him into first admitting that he was outside the house while companions entered, and that they told him what they had done. He then confirmed the interrogator's suggestion that he was with them in the house, watching them as they abused the victim, stole money and jewelry, and then set her on fire. Next the interrogator confronted him with incongruities in his statement and drew the admission that he was the sole criminal actor.

I have the distinct impression that the confession would be subject to challenge because of the inadequacy of the warnings

and the suggestion of benefits from "telling the truth."[2] These infirmities, concededly, are of no consequence if the defendant later enters an understanding and voluntary plea of guilty,[3] but the confession does not put an end to the duty of the trial judge to determine that there is factual basis for the plea. The audio tapes of the confession reveal that the interrogator was firm and aggressive; the movant's answers were in a halting voice, brief, and for the most part in response to leading questions. Nothing in his prior history suggested any possible motive for the crime to which he admitted. The attempts to develop a history of sexual obsession are inconclusive. The prosecutor during his recitation of the evidence against Wilson made no assertion that the victim had been sexually abused, and the autopsy showed no indication of sexual abuse. In the final portions of his statement, the movant said that the jewelry he had taken from the victim's house was hidden in a barbecue pit in his yard, but it was not found there. The record shows little or no corroboration of the confession.

The plea hearing documents included a four-page "petition to enter plea of guilty pursuant to *North Carolina v. Alford*," 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970), and a "memorandum of plea bargain," both signed by the movant.[4] These prolix documents, full of legalisms, should be read in the light of the movant's answer to an inquiry about his reading ability made during his interrogation. With reference to the top line of witness Gary Wall's statement, shown to the movant by the

**2.** Officer Kahre testified at the postconviction hearing as follows:

[MOVANT'S ATTORNEY]

Q During the course of your interview with the Defendant, uh, was anything said by either yourself or Officer Merritt, uh, to the effect of just wanting to help the Defendant? Uh, were there any offers made to him during the course of the interview as far as just wanting to get him help?

[OFFICER KAHRE]

A Yes.

Q Okay. What was the nature of those offers, and what was the context of that, those offers of help?

A I don't know whether I can tell it to you word for word or not, uh, but basically, uh,

uh, just generally offered him, offered him help—the best thing he could do was just, you know, tell us what happened, and we'd get him some help one way or another, somehow.

**3.** *Kunkel v. State*, 501 S.W.2d 52, 54 (Mo.1973).

**4.** I do not regard as insignificant the switch from the "Alford plea," which does not admit guilt but focuses on difficulty of defense, to an admission of guilt when the plea was taken. I am confident that the movant did not have the least understanding of the meaning of an *Alford* plea. Yet he might have been "softened up" by signing a statement in which he did not admit guilt, so that he responded to the sentencing judge's lead during the guilty plea hearing.

interrogator, the following exchange took place:

> INTERROGATOR: Do you read and write English without the aid of glasses?
>
> JOHNNY: Yeah.
>
> INTERROGATOR: Read that top line for me.
>
> JOHNNY: I don't. I don't know those big words. That's "statement" "under" and "arrest."
>
> INTERROGATOR: OK. Voluntary statement not under arrest. Right? . . .

In view of this demonstration of a very limited reading ability,[5] the petition and memorandum do not go very far toward demonstrating that the plea of guilty was voluntarily and intelligently made. I doubt that the movant had any idea what the petition was all about.

The transcript of the guilty plea hearing covers 31 pages. In examining this transcript we are providing the initial appellate review of the performance of the sentencing judge in determining whether the plea was voluntarily and intelligently entered. We are fully as able as the postconviction hearing judge to evaluate the adequacy of the plea hearing. The principal opinion describes the inquiry as "punctilious."[6] I do not sense the "painstaking efforts of the trial court to ensure Wilson understood the plea agreement and was offering it voluntarily and knowingly," which the principal opinion finds. I have three primary criticisms of the plea hearing.

First, the transcript raises substantial questions about whether the plea was voluntarily and intelligently made. When asked why he was pleading guilty, the movant twice replied, "I don't know." When the judge responded at some length that these responses were not adequate the movant replied, "I don't understand what you're saying." At this point many judges would have suggested that the proceedings be suspended so that the movant could consult with counsel. This judge, however, kept the movant on the carpet and asked a long series of questions, almost all calling for yes or no answers. I do not find support for the statement in the principal opinion that the movant "varied his answers from affirmative responses to negative responses and from short observations to lengthy comments," or that he "corrected the prosecution's version of the facts underlying his guilty plea." The factual statements in the hearing came almost entirely from the trial judge and from the prosecutor, with very little input from the movant or his counsel. The only "correction," and the most lengthy response, came because the prosecutor reported that the movant had stopped by the police station to pick up his billfold, whereupon the movant advised the judge that he had been taken to the station by a police officer.

Second, the trial judge should have persisted in his efforts to get the movant to expound the details of the crime in his own words. This is especially so because of the expert testimony indicating that the movant was peculiarly subject to suggestion, and because of his denials of guilt to the medical examiners. Early in the proceeding the judge asked the movant, after telling him that he had to make sure that he understood what he was doing:

> Why don't you tell me in your own words, just talk to me a little bit. Tell me what happened here, and, and what you did and why you want to plead guilty, why you're wanting to avoid the death penalty? Just tell me everything you can about this.

---

5. The psychological test results of Fulton State Hospital indicated movant reads at the 6.0 grade level. Dr. Foster, movant's expert, testified at the competency hearing that movant's verbal comprehension scores ranked in the first percentile. This score indicates that 99% of the general population has verbal comprehension superior to the movant's. Further, the movant has no driver's license because he was unable to pass the written test. These test results were presented to Judge Elliston at the competency hearing, prior to movant's entering his guilty plea.

6. Punctilious is defined as: "attentive to punctilios: marked by precise exact accordance with the details of codes or conventions." A "punctilio" is "a nice detail of conduct in a ceremony, a procedure, or in the observance of a social or moral code: a point of behavior about which one is fastidious." Webster's Third International Dictionary 1843 (unabridged 1981).

The only response was, "I don't understand what you're saying." After this response the judge completely abandoned any further effort to get the movant to tell him anything about the offense in his own words. Because of the infirmities already detailed, the trial judge, in determining whether the plea was made with understanding and factual basis, was absolutely obliged to make further efforts to get the defendant to provide his own description of the offense, rather than relying solely on the prosecutor's statement and then simply asking the movant to confirm it.

Third, the trial judge seemed to dwell on the spectre of the death sentence, mentioning the death penalty at least 16 times in his interrogation. It is perfectly proper for the prosecution and the defense to negotiate a plea bargain in a first degree murder case in which the death penalty is waived in consideration of the plea. The possibility of a death sentence is not inherently coercive,[7] but the movant might well have gathered from the tone of the questioning that the trial judge believed that a death sentence would be a virtual certainty if he stood trial. The spectre was reinforced by the movant's counsel, whose sole part in the proceedings consisted of reporting to the court that he had advised the movant that a death sentence was, in his opinion, a probability. The threat of execution permeates the entire proceeding.[8]

There are other troubling circumstances. The Miranda warnings, as shown by the transcribed tapes, were quick and formal. The officers relied primarily on the movant's reading ability in establishing the waiver of these rights, even though, as shown above, this ability was seriously limited. During the final portion of his interrogation, after he had admitted that he was the sole criminal actor, the respondent asked, "When am I getting out of here?" This indicates that he had little comprehension of the gravity of his admissions. None of these circumstances would have great weight if the movant had been con-

victed following a trial, but they cast further doubt on this case, in which the substantial indications of an understanding plea are not abundant. I am also troubled by the movant's thought that he might be sentenced to the state hospital at Fulton, perhaps induced by the investigating officer's having told him that he would not necessarily go to the penitentiary. Nor am I satisfied that the sentencing judge made it perfectly clear that the sentence was "without probation or parole." The movant might have gathered from the judge's advice that action by the governor might not be too long delayed.

The principal opinion reminds us of our obligation to "look at the whole record that was before the motion court" and not to "limit the review of Wilson's responses to a few questions and answers taken out of context from the other inquiry that occurred." The portion of the interrogation set out in the principal opinion shows that my analysis is soundly grounded in the record. The trial judge seemed much more interested in providing a good paper record than in communicating effectively with the movant. It appears that he and the movant's counsel were satisfied that the movant was guilty, and considered that the life sentence without trial was the easiest option. The judge expected the case to be disposed of by guilty plea and carefully guided the proceedings toward that end.

The communication with the movant was inadequate to demonstrate factual basis for the plea, or that it was made voluntarily and intelligently. The plea is infirm as a matter of law and the movant should be allowed to withdraw it so that he may have a trial.

## II. Newly Discovered Evidence

After the plea proceedings had been completed one Chris Brownfield, an inmate in the Kansas State Penitentiary at Lansing, came forth with a statement in which he

---

7. See Brady v. United States, 397 U.S. 742, 750, 90 S.Ct. 1463, 1470, 25 L.Ed.2d 747 (1970). Accord Samuels v. State, 770 S.W.2d 717, 722 (Mo. App.1989).

8. Movant testified at the 24.035 hearing that he believed if he received the death penalty he would be executed the day after he arrived at the penitentiary.

said that he had been a participant in the crime, and that the movant was not involved. Brownfield made several statements to the press and wrote letters to Missouri officials, but refused to provide sworn testimony at the 24.035 hearing. The hearing judge concluded that Brownfield's statements were incredible, pointing to inconsistencies and contradictions in his story.

The principal opinion now holds that a claim of newly discovered evidence may not be raised in 24.035 proceedings, and suggests other alternatives such as a motion to withdraw guilty plea under Rule 29.07(d), which must be filed in the sentencing court, or a petition for writ of habeas corpus, in which the proper venue under Rule 91.02 is the circuit court in the place of confinement. Thus, under the principal opinion, possible forums are available for the movant's claims of newly discovered evidence, in which he can present the evidence offered at the postconviction hearing and also the additional evidence consisting of tapes of conversations with Brownfield which were tendered to us before oral argument. By the holding of the principal opinion the postconviction court's findings on the issue of newly discovered evidence are of no effect because the issue was beyond the court's 24.035 jurisdiction.[9]

I will not question this procedural ruling further. It is supported by paragraph (a) of Rule 24.035, although the certificate required by paragraph (d), that the motion "shall include every ground known to the movant for vacating, setting aside, or correcting the judgment or sentence," and the similar certificate required by counsel un-

der paragraph (e), would support a broader construction of the rule. It would be efficient to modify the rule to require claims of this kind to be included in a 24.035 motion if known at the time of filing. I believe that the state is obliged to provide some procedure to hear and dispose of claims relating to newly-discovered evidence which might exonerate the movant.[10]

We should take a lesson from the English courts, which share our dedication to the cause of justice. Six alleged terrorists (the "Birmingham Six") were jury convicted of a murder committed in 1974. The conviction was affirmed by the Criminal Division of the Court of Appeal. It survived two later inquiries in the House of Lords and the Court of Appeal. *Hunter v. Chief Constable of West Midlands*, 3 All E.R. 727 (1981). Then troubling charges of fabrication of evidence and corruption in the local police force appeared. The Court of Appeal again reviewed the case, under a procedure authorized by governing law, and concluded that the convictions were "unsafe and unsatisfactory," so that they should be quashed. *R. v. McIlkenny*, —— All E.R. ——, 14 N.L.J. 456 (1991). This case is a stronger one for relief than the English case, because here there was no jury trial.

The alternative of application for executive clemency, suggested in the principal opinion, is not a viable one. The governor may commute a sentence, release a prisoner, or grant a full pardon, but he has no authority whatsoever to grant a trial to one who has pleaded guilty. Mo. Const. 1945, art. IV, § 7. *See also* § 565.020.2, RSMo

---

**9.** I commend the postconviction judge for making findings and conclusions on the issue, which could then be used on appellate review, even though he too concluded that newly discovered evidence could not be considered as a ground for 24.035 relief.

**10.** *See Smith v. Murray*, 477 U.S. 527, 106 S.Ct. 2661, 91 L.Ed.2d 434 (1986) stating:
"'[i]n appropriate cases' the principles of comity and finality that inform the concepts of cause and prejudice 'must yield to the imperative of correcting a fundamentally unjust incarceration.'" Accordingly, "where a constitutional violation has probably resulted in the conviction of one who is actually inno-

cent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default."
*Id.* at 537, 106 S.Ct. at 2668 (citations omitted) (quoting *Murray v. Carrier*, 477 U.S. 478, 495–96, 106 S.Ct. 2639, 2649, 91 L.Ed.2d 397 (1986). In *Jones v. State of Arkansas*, 929 F.2d 375 (8th Cir.1991), the Eighth Circuit adopted this standard stating:
If one is 'actually innocent' of the sentence imposed, a federal habeas court can excuse the procedural default to correct a fundamentally unjust incarceration.
*Id.* at 381 (citations omitted).

1986. All this movant is seeking is a trial and, under the record, he is entitled to no more.

The result of this case, unfortunately, is a further demonstration of the reluctance of this Court to afford trials in civil or criminal cases which have been disposed of without trial, even though there are substantial indications that a trial would serve the interests of justice. In *Barney v. Suggs*, 688 S.W.2d 356 (Mo. banc 1985), this Court denied a right of appeal from a default judgment even though clear statutory language indicated that there was an appealable order. In *Sprung v. Negwer Materials, Inc.*, 775 S.W.2d 97 (Mo. banc 1989), the court left a final judgment rendered under manifestly inequitable circumstances in place even though there was minimal fault on the part of the defendant and a prompt request for consideration after the error was discovered. In *Wilkins v. State*, 802 S.W.2d 491 (Mo. banc 1991), the Court refused to allow a defendant who was a juvenile certified as an adult to stand trial for his life because he had expressed a present intention to forego legal representation, to plead guilty, and to be put to death.[11] We rather upheld the trial court's action in carrying the expressed death wish into effect, after a hearing which was essentially nonadversary. Finality is important but should not be a fetish. The interest of finality is minimal when there has been no trial, and when a request for trial has been made without undue delay. The number of meritorious cases is not large enough to impose serious burdens.

There is a time to affirm and a time to reverse, a time to defer and a time to superintend. The cause of justice and the integrity of our procedures would be best served by our exercising our powers of review to grant relief in this case, in which there are so many flaws in the record. The movant's denial of guilt at the postconviction hearing and on other occasions, and the clearly admissible evidence of commission of the offense by another, are additional circumstances supporting the granting of relief.

11. Wilkins' understanding and desires were probed by the trial judge in much greater depth than was the case here, and with responses

I would reverse and remand with directions to allow the movant to withdraw the guilty plea.

which were much more eloquent and understanding than this movant's.